IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| E.E.F.,<br><br>Petitioner,<br><br>vs.<br><br>WARDEN OF THE MESA VERDE ICE PROCESSING CENTER, *et al.*,<br><br>Defendants. | Civil No. 26-09061 MWJS<br><br>ORDER GRANTING WRIT OF HABEAS CORPUS<br><br>A# 204-449-644 |

**ORDER GRANTING WRIT OF HABEAS CORPUS**

Petitioner "E.E.F." petitions for a writ of habeas corpus under 28 U.S.C. § 2241.[1]

He contends that when immigration authorities detained him without first affording

[1] Petitioner's full name is not, of course, "E.E.F.," but he moves to proceed using his initials and for entry of a protective order protecting his identity and the identities of his minor children. Dkt. No. 3. As Petitioner explains, the case involves sensitive information about Petitioner's minor children, as well as sensitive medical and other information about Petitioner. *Id.* at pg. 2. And because Petitioner's "children share his surname," public disclosure of his name "would identify them." *Id.* Respondents were invited to respond to this motion, Dkt. No. 6, and they declined to do so, Dkt. No. 7.

Given the compelling interests at stake, the court finds that the need for anonymity—at least at this stage in the proceedings—outweighs countervailing considerations. *See Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067–68 (9th Cir. 2000). Accordingly, Petitioner's motion to proceed via pseudonym is GRANTED and the court ORDERS that Petitioner may proceed in this action under the initials "E.E.F."; that Petitioner's minor children must be identified in all filings only by their initials or ages; and that any document filed in this action that contains the full name of Petitioner or of any of his minor children, or the medical or educational records of any minor child, must be redated or filed under seal.

him notice and a fair opportunity to be heard, they violated his constitutional due process rights. And indeed they did.

Some background is necessary. Petitioner was born in Mexico and entered the United States without inspection in 2003 when he was still a minor. Dkt. No. 1, at pg. 13. In 2013, Petitioner applied for and was granted Deferred Action for Childhood Arrivals (DACA), along with the employment authorization that accompanied it. *Id.* His most recent DACA grant was valid from February 2024 to February 2026. *Id.*

This past grant of DACA status is significant. "[T]o be eligible for DACA, applicants must demonstrate that they came to the United States before the age of 16, have continuous residence in the United States since 2007 and undergo a criminal background check." *Perez Flores v. Warden*, 26-cv-06283, 2026 WL 2532099, at *3 (E.D. Cal. Aug. 27, 2026) (citing 8 C.F.R. § 236.22(b)(1)–(6)). And because "DACA requires a robust showing regarding lack of flight risk or danger to the community," *id.* at *2, the government's decision to grant Petitioner this status reflected a finding that he presented neither a risk of flight nor a danger.

The government demonstrated its ready acceptance of Petitioner's presence in the United States in other ways. While a DACA recipient, Petitioner applied for and obtained approval to travel outside the country on advance parole in 2022 and again in 2024. *Id.* at pgs. 13–14. Pursuant to those approvals, Petitioner traveled outside the United States, each time staying outside of the country for a few weeks. On each

occasion, upon his return, Petitioner presented himself at ports of entry, where he was inspected by U.S. Customs and Border Protection (CBP) and paroled into the United States. *Id.* at pg. 14.

And the government's positive assessment of Petitioner has not proved unfounded. Since he was granted DACA, Petitioner has continuously lived in California and married his wife, a U.S. citizen. *Id.* at pgs. 14–15. He has three U.S. citizen children from a prior relationship, over whom he shares joint custody. *Id.* at pg. 16. His youngest child has severe autism and relies on special education services and specialized daily care from his parents. *Id.* And in addition to caring for his children's health, Petitioner maintained stable employment and thus provided for them economically. *Id.*

Until, that is, he was arrested and detained by immigration authorities. His arrest occurred on October 13, 2026, when Petitioner appeared at U.S. Citizenship and Immigration Services (USCIS) for an adjustment of status interview. *Id.* at pgs. 14–15. While Petitioner was in that interview—seeking to obtain lawful immigration status—an Immigration and Customs Enforcement (ICE) supervisor issued a warrant for his arrest, and upon completion of the interview, Petitioner was taken into custody. *Id.* at pg. 15. The only reason ICE provided for Petitioner's arrest was that he lacked lawful immigration status. *Id.* He has remained in immigration detention since.

One could conceivably imagine that Petitioner's arrest and detention might have been the result of a single blemish on his record: in April 2026, he was convicted of the misdemeanor of driving under the influence. *Id.* at pg. 17. But immigration authorities have never suggested that Petitioner's misdemeanor conviction played any role in his arrest or detention. Nor has the government ever suggested that this single conviction now renders Petitioner either a flight risk or a danger to the community, despite his longstanding and strong ties to the community and his otherwise pristine record.[2]

Whatever the cause of his detention, Petitioner argues that it was carried out unlawfully. Invoking this court's habeas jurisdiction, he contends, among other things, that his arrest and detention without pre-deprivation process violates his procedural rights under the Due Process Clause of the Fifth Amendment. And he starts with a strong hand. Many district judges have granted relief in cases analogous to this one—that is, in cases where a noncitizen obtained a protected liberty interest because of a prior government finding that he was neither a flight risk or a danger to the community (whether through a grant of DACA or in some other way), and where the government deprived the noncitizen of that liberty interest without first affording notice and an opportunity to be heard. *See, e.g.*, *Anderson v. Chernut*, No. 26-cv-01960, 2026 WL 809990 (E.D. Cal. March 24, 2026); *M.Z. v. Wofford*, No. 26-cv-06461, 2026 WL 2606891 (E.D. Cal.

---

[2] Perhaps that is because, after his arrest on this offense in 2025, Petitioner completed a Victim Impact Panel, attended Alcoholics Anonymous meetings, enrolled in a licensed DUI program, and completed a court-ordered first-offender program. *Id.*

Sept. 2, 2026); *Nepal S. v. Warden, Golden State Annex Detention Facility*, No. 26-cv-06126, 2026 WL 2363564 (E.D. Cal. Aug. 13, 2026); *Carlos Eduardo D.J. v. Mullin*, No. 1:26-cv-04029-MWJS, 2026 WL 1508426 (E.D. Cal. May 29, 2026). The court has considered these precedents and concluded that they reached the correct result based on the current state of Supreme Court and circuit precedent. To resolve this case, therefore, the court need only determine whether there is any factual or legal basis to distinguish those prior decisions.

The court issued an order to show cause, calling on Respondents to identify "any factual or legal issues in this case that render it distinguishable from prior cases" such as those listed above. Dkt. No. 6. In their response, Respondents concede that "this case would fit into the category of cases in which the court has found that the petitioner's previous parole in the United States . . . result[ed] in immediate release." Dkt. No. 7, at pg. 2. But Respondents offer a single argument for reaching a different conclusion: in their view, the Ninth Circuit's recent decision in *Padilla v. U.S. Immigration & Customs Enforcement*, --- F.4th ----, 2026 WL 2822044 (9th Cir. Sept. 21, 2026), has transformed the legal landscape for cases like these. *Id.* at pgs. 1–2.[3]

[3] Respondents also make the blanket assertion that they "dispute all allegations and claims" in the petition. Dkt. No. 7, at pg. 1. But they do not identify any factual disputes that might justify a departure from the cases cited in the court's order to show cause. Nor do they request any further hearing or process to develop any such argument.

But *Padilla* is a poor fit for Respondents' argument that the Ninth Circuit has somehow recently curtailed the freedom of noncitizens from arbitrary arrest and detention. After all, several pages of the panel majority opinion are devoted to emphasizing that "the principle that the government cannot arbitrarily detain people, including noncitizens, has been a central tenet of British and American legal traditions since the thirteenth century." *Id.* at *16. *See generally id.* at *16–19. And while *Padilla* did recognize that due process rights are limited by statute in certain specific respects, it also made clear what respects it had in mind: "the conditions for an alien's lawful entry into this country." *Id.* at *11 (cleaned up). In the particular context of a noncitizen's rights "regarding admission," the Ninth Circuit concluded—following Supreme Court precedent—that a noncitizen has only those rights provided by statute. *Id.* The panel majority then took pains to make clear that in finding a noncitizen's rights to admission limited in this way, it was not suggesting that a noncitizen's right to be free from arbitrary detention were so cabined. *Id.* at *19 (emphasizing that "the government's strictly circumscribed detention authority, a pillar of our common law tradition for almost a millennium, stands in contrast to the political branch's plenary authority to decide which aliens to admit" (cleaned up)). *See generally Orael v. Warden, Cal. City Detention Ctr.*, 26-cv-08550, 2026 WL 3333883, at *1 (E.D. Cal. Nov. 4, 2026) (recognizing, as *Padilla* did, that "admission and detention are distinct").

Respondents nonetheless argue that *Padilla*'s treatment of a doctrine called the "entry fiction" supports its position. That doctrine, *Padilla* explains, "encompasses those apprehended at or very near a point of entry and then either paroled into the United States or detained in the United States pending a determination of their admissibility." 2026 WL 2822044, at *13. Such individuals "are treated as if stopped at the border with respect to certain legal rights," and so "despite their physical presence in the United States, their due process rights regarding admission are limited to whatever the procedure authorized by Congress is." *Id.* (cleaned up). And in Respondents' view, this means that a noncitizen paroled into the country is subject to the mandatory-detention regime of 8 U.S.C. § 1225(b), which does not apply to unadmitted noncitizens "present in the interior of the country" but does apply to unadmitted noncitizens "entering the United States at the border." *Rodriguez Vazquez v. Bostock*, 183 F.4th 1160, 1193 (9th Cir. 2026). And, Respondents say, it further means that such noncitizens can claim no greater due process rights than what § 1225(b) provides them (namely, mandatory detention).

Respondents' argument suffers from at least two fatal flaws. The first, as noted earlier, is that it overreads *Padilla*, which explicitly distinguished between admissibility and detention. The *Padilla* opinion is careful to say that when the entry fiction applies, a noncitizen's "due process rights *regarding admission*" are limited to what Congress provides. 2026 WL 2822044, at *13 (emphasis added). It nowhere suggests that the

right of a noncitizen physically present in the Untied States to be free from arbitrary detention—a right "at least as old as the Magna Carta," *id.* at *17—is similarly limited. And so *Padilla*'s discussion of the entry fiction in the context of admission does not support departing from the cases cited in the court's order to show cause, in which a protected liberty interest in being free from arbitrary detention has been recognized.

A more fundamental flaw, of particular significance to this case, is that Petitioner's due process liberty interest does not arise merely from his having been paroled into the United States twice over. It consists, too, in the government's earlier grant of DACA, which necessarily implies "a robust showing regarding lack of flight risk or danger to the community." *Perez Flores*, 2026 WL 2532099, at *2. As the many cases cited in the court's order to show cause demonstrate, a finding of this sort vests a noncitizen with a protected liberty interest, one that ordinarily cannot be stripped away without pre-deprivation process. Nothing Respondents say about the entry fiction and parole addresses this separate basis on which Petitioner's liberty interest rests.

Given that Respondents have offered no proper basis on which to distinguish the cases cited in the court's order to show cause—indeed, given that their only proffered distinction is unpersuasive—the court concludes that Petitioner possessed a constitutionally protected liberty interest. There is no dispute that in arresting and detaining Petitioner, Respondents deprived him of that interest. And Respondents do not contend that "there is evidence of urgent concerns or an especially strong

government interest that suffices to justify a post-deprivation, rather than a pre-deprivation, hearing." *Carlos U.G. v. Warden, Cal. City Detention Ctr.*, 1:26-cv-04427, 2026 WL 1999947, at *4 (July 10, 2026) (cleaned up). It is hard to imagine what those concerns could possibly have been. When Petitioner was arrested in October 2026, he was not engaged in any criminal conduct; he was reporting as scheduled for a USCIS interview to secure an adjustment of status based on his marriage to his U.S. citizen wife. And by that point, six months had passed since Petitioner was convicted of his sole misdemeanor (and more than a year since his earlier arrest on that charge). Surely a pre-deprivation hearing could have been afforded within that six-month period if that conviction was the reason for Petitioner's detention. At the least, Respondents do not argue otherwise.

It follows that Petitioner was entitled to pre-deprivation process before his arrest and detention. And because he was denied that process, "he must be ordered immediately released because it is not possible to remedy that constitutional violation with anything less." *Id.* at *3.

Therefore, IT IS HEREBY ORDERED that the petition for writ of habeas corpus, Dkt. No. 1, is GRANTED as to Petitioner's first claim for relief (his constitutional due process claim). Because it is unnecessary to resolve the other counts in the petition (which raise arguments under the Administrative Procedure Act, the Immigration and Nationality Act, and substantive due process), the court declines to do so. Respondents

are ORDERED to immediately release Petitioner from their custody. Respondents shall not impose any additional restrictions on Petitioner, unless that is determined to be necessary at a future pre-deprivation/custody hearing. Respondents are permanently ENJOINED AND RESTRAINED from re-arresting or re-detaining Petitioner absent compliance with constitutional protections, which include, at a minimum, pre-deprivation notice describing the change of circumstances necessitating Petitioner's arrest and detention, and a timely hearing. At any such hearing, the government shall bear the burden of establishing, by clear and convincing evidence, that Petitioner poses a danger to the community or a risk of flight, and Petitioner shall be allowed to have their counsel present. This order does not address the circumstances in which Respondents may detain Petitioner in the event Petitioner becomes subject to an executable final order of removal, or in the event exigent or urgent circumstances arise that justify arresting and detaining Petitioner before pre-deprivation process can be provided.

IT IS SO ORDERED.

DATED: November 9, 2026, at Honolulu, Hawai‘i.

UNITED STATES DISTRICT COURT DISTRICT OF HAWAII

/s/ Micah W.J. Smith

Micah W.J. Smith
United States District Judge